UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**IN ADMIRALTY**

IN THE MATTER OF:

PLAYTIME                     WATERSPORTS
EQUIPMENT   RENTALS,   INC.,   D/B/A
PLAYTIME      WATERSPORTS      and
ANDREW SETT, AS OWNER *PRO HAC
VICE,* OF A MODEL YEAR 2017
YAMAHA  PERSONAL  WATERCRAFT,
BEARING  HULL  IDENTIFICATION  No.
YAMA1840K617 and Its Engines, Tackle,
Appurtenances, Etc.; A MODEL YEAR 2017
YAMAHA  PERSONAL  WATERCRAFT
BEARING  HULL  IDENTIFICATION  No.
YAMA3444D717 and Its Engines, Tackle,
Appurtenances, Etc.; AND A MODEL
YEAR  2016  YAMAHA  PERSONAL
WATERCRAFT     BEARING     HULL
IDENTIFICATION  No.  YAMA2964L516,
and Its Engines, Tackle, Appurtenances, Etc.,
IN A CAUSE FOR EXONERATION FROM
OR LIMITATION OF LIABILITY.

CASE NO.: 1:17-cv-24513-FAM

      Petitioners.

_____/

**PETITIONERS' OPPOSITION TO CLAIMANT'S MOTION FOR
SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Petitioners Playtime

Watersports Equipment Rentals, Inc. d/b/a Playtime Watersports and Andrew Sett as owners *pro*

*hac vice*, of a model year 2017 Yamaha personal watercraft, bearing Hull Identification No.

YAMA1840K617 and its engines, tackle, appurtenances, etc.; a model year 2017 Yamaha

personal watercraft bearing Hull Identification No. YAMA3444D717 and its engines, tackle,

appurtenances, etc.; and a model year 2016 Yamaha personal watercraft bearing Hull

1

Identification No. YAMA2964L516, (collectively hereinafter "Playtime") hereby file this motion and incorporated memorandum of law opposing Claimant's motion for summary judgment (DE 25).

<u>STATEMENT OF MATERIAL FACTS</u>

Pursuant to Local Rule 56.1(a), Playtime submits the following statement of facts in opposition to the statement of facts submitted in Claimant's motion for summary judgment using corresponding paragraph numbers:

¶ 4.    On May 29, 2017, David Wood, Jason Gabay, Santos Mitjans, Steven Gil, and Daniel Gomez were all employed by Playtime.   **Exhibit A**, Transcript of Andrew Sett's Deposition (hereinafter "Sett Tr." or Exhibit A) at 18:3-14.  At the time of the subject accident, David Wood, Jason Gabay, Steven Gil, and Santos Mitjans were working at Playtime's PWC livery located on Miami Beach.  Id. at 21:21-22:1.  Daniel Gomez was driving Playtime's truck from its off-site storage facility to its rental location on the beach at the time of the incident.  Id. at 26:5-23.

¶ 5.    All Playtime employees are required to be certified in boater safety by completing a boater safety course approved by the National Association of State Boating Law Administrators (NASBLA).  Sett Tr. at 19:20-20:4; 39:5-13.  Playtime also gives all employees on-the-job training and instructs its employees using training aides provided by the Florida Fish and Wildlife Conservation Commission (FWC).  Sett Tr. at 21:1-5; 29:23-30:13.

¶ 16.   Playtime's customers review the Rental Contract and Waiver and the written instructions on the PWC Safety Checklist at Playtime's booth in clear view of the shoreline and the PWCs they will rent.  See **Exhibit A at Exhibit 3**, FWC Boating Incident Report at 28 (depicting the booth's location on Miami Beach).  Then, the customers receive verbal and written

instructions in on-land and on-the-water demonstrations near and on the PWCs themselves. Sett Tr. 85:13-92:13

¶ 17.    Customers like Claimant who were born after January 1, 1988 take the FWC's Boater Safety test, and are given a copy of their test and Temporary Boater Safety Certificate for their records. Sett Tr. 61:6-21.

¶ 19.    Claimant signed a PWC Rental Checklist and initialed next to each instruction indicating that he understood it. **Exhibit A at Exhibit 4**, PWC Rental Checklist. Claimant did not initially recall the checklist at his deposition, but after seeing the checklist and recognizing his handwriting, he admitted that he had signed it. **Exhibit B**, Transcript of Deposition of Stanley DuPont (hereinafter "DuPont Tr." or Exhibit B) 119:23-123:12.

¶ 20.    Mr. Sett explained at his deposition that Claimant did not date the checklist when it was signed, so Playtime employees dated it later that day. Sett Tr. 147:19-148:14.

¶¶ 22-28.    Playtime employs a multi-faceted safety training program. First, Playtime employees check customers' identification and ensure that customers are of the appropriate age to rent a PWC and that the customers are physically capable of handling the PWC. Sett Tr. 44:20-45:10. Next, customers read and sign a waiver stating that they have read all required instructions, that they understand those instructions, and that they do not have any physical limitations that would prevent them from operating the PWC safely. Sett Tr. 47:21-48:5. Then, Playtime's employees explain the PWC Safety Checklist to the customers, and the customers read and sign the checklists, initialing that they understand each instruction. Playtime Sett Tr. 42:14-43:16. This checklist was prepared by the FWC. Sett Tr. 96:24-97:1. Customers, like Claimant, who were born after January 1, 1988 are given a boater safety study guide to review, and then they must take the boater safety test provided by the FWC to receive their temporary

boater safety ID certificate.  Sett Tr. 46:3-25.  Customers must answer at least 19 of 25 questions correctly to achieve a passing score.  Sett Tr. 47:4-8.  Then, Playtime conducts an on-land and on-water demonstration covering PWC operation, including starting and stopping the PWC, using the throttle, steering, and safely attaching and detaching the lanyard containing the cut-off switch.  Sett Tr. 85:13-87:1.  Instructors explain the ride area and swim zones to customers at the waterline.  Sett Tr. 87:15-23.  The on the water demonstration also covers safely recovering from falls off of a PWC.  Sett Tr. 91:21-92:13.  Customers are also reminded that PWCs do not have brakes, that they should maintain a distance of 100 feet from other vessels or people in the water, and that they should avoid dangerous maneuvers like jumping waves or wakes.  Sett Tr. 92:16-93:24.  The customer verbally acknowledges that they understand these instructions.  Id. Playtime employees visually observe customers in the shallower water to ensure that they can safely handle the PWC before customers are permitted to continue their ride in deeper water. Sett Tr. 85:6-12; 102:25-104:24.  Playtime also has employees patrol the ride area and issue warnings if customers are riding recklessly or failing to obey the safety rules.  Sett Tr.  95:8-15. In addition, Playtime has its customers review the PWC Riding Practice Guide located on the jet ski's console directly in front of the driver showing the characteristics of the PWC and explaining its proper handling.  Sett Tr.  100:3-20.

¶ 29.   Claimant rented a PWC from Playtime within 1 hour before 12:47 p.m.  See **Exhibit A at Exhibit 2**, Claimant's Rental Contract at 1 (showing 60 minute rental period); Sett Tr. 59:13-15; **Exhibit A at Exhibit 3**, Boating Accident Report at 1 (stating that the accident occurred at 12:47 p.m.).

¶ 31.   Playtime logs the time each jet ski enters the water and returns during the day.  As a part of its usual practices, the papers with these logs are discarded at the end of the day.  Sett

4

Tr. 66:12-67:17.  Playtime complied with all of the FWC's requests for documentation.  Sett Tr. 169:4-12.  The paper with this information was not requested by the FWC.  Sett Tr. 135:12-21; 174:20-25.

¶ 33.   Playtime checks its customers' photographic identification to ensure that they are old enough to rent a PWC.  See **Exhibit B at Exhibit 3**, Rental Contract for Stanley DuPont (showing where Playtime employee transcribed Claimant's driver's license number).

¶¶ 34-35.     Playtime gives boater safety tests to its customers born after January 1, 1988.  Customers must answer at least 19 out of 25 questions correctly to achieve a passing score.  Sett Tr. 45:16-47:8.  Mr. Sett was informed by Playtime's Operations Manager, David Wood, that Claimant had taken and passed the boater safety test on the day of the incident.  Sett Tr. 60:22-61:5.

¶ 36.   Playtime sends its customers' completed tests back to the State.  Sett Tr. 47:9-11. The other copy of the test is sent to the customer.  Sett Tr. 61:10-18.

¶ 37.   A copy of Claimant's test was available to the FWC when the FWC officers were completing their report.  Sett Tr. 63:10-17.[1]

¶ 38.   Claimant was admitted at Jackson Memorial Hospital for monitoring following the incident.  He discharged from Jackson Memorial Hospital after two days.  No surgical intervention was needed.  He followed up with physicians at Jackson Memorial Hospital on July 31, 2017 where he denied any pain, was cleared to work and discharged from care.  **Exhibit C** Jackson Memorial Health Records at 2.

---

[1] See also Sett Tr. at 115:5-12 ("Q: There is no policy for investigating why the accident or injuries happened?  Mr. Toole: Objection, form.  The Witness: Not us specifically.  We leave that to the professionals who are, I guess, are the Coast Guard, FWC, beach patrol, whoever the body is at the time that is investigating.").

¶ 40.   After conducting a thorough investigation of the accident, FWC Officer Gerald Leathers stated in his final report, "I am unable to come to any conclusion as to who was operating the PWC that hit the victim, Mr. Stanley DuPont." **Exhibit D**, Transcript of Deposition of FWC Officer Gerald Leathers (hereinafter "Leathers Tr." or Exhibit D)100:2-24; **Exhibit D at Exhibit 8**, Investigative Case Report, p. 7.  Officer Leathers explained at his deposition that his investigation was unable to determine whether Claimant was hit by a PWC rented from Playtime, a PWC rented from a nearby competing livery, or a PWC owned by a private individual.

¶ 41.   Following the Artamon incident, Playtime re-trained its employees to confirm that all of them understood the requirements for paperwork and boater safety training.  Sett Tr. 119:12-120:11.  Playtime also moved the former manager, John Oaks, who had been working on the day of the Artamon incident out of his managerial role at the company.  Sett Tr. 121:1-5.

In addition, Playtime provides the following facts for the Court:

1.      At his deposition, Claimant testified that he was not paying attention to the instructions that Playtime provided during the training period.  **"I don't know what he was reading because I wasn't really paying attention like that."**  DuPont Tr. 64:8-10.

2.      Claimant testified at least five times that he specifically remembers Playtime's instructors showing him the brakes to the PWC. (DuPont Tr. 63:23-25; Id. at 64:3-4; Id. at 68:24-69:1; Id. at 78:19-22; Id. at 80:6-7).  Like other boats, PWCs do not have brakes.  Playtime warned Claimant of the PWC's lack of brakes in its verbal safety instructions (Sett Tr. 92:16-93:24), on the PWC Safety Checklist (**Exhibit A at Exhibit 4**), on a large yellow warning sign located on its booth (**Exhibit E**), and on a warning located immediately in front of Claimant's seat on the PWC (**Exhibit F**).

3.      Claimant further testified that the PWCs did not have any warnings or instructions on them.  DuPont Tr. at 80:11-81:2.  In fact, there are large, prominent warnings on the consoles of the PWCs immediately in front of the driver.  **Exhibit F**, Photographs of PWCs.

4.      Claimant had been specifically instructed not to attempt to ride or jump waves or wakes in Playtime's verbal instructions and on-the-water training (Sett Tr. 92:16-93:24), on the PWC safety checklist that he initialed and signed (**Exhibit A at Exhibit 4**, PWC Safety Checklist), and on the directions placed immediately in front of the driver's seat on the console of his PWC (**Exhibit F**, Photograph of PWC).  Claimant testified at his deposition that immediately before he fell, he attempted to turn into a wave.  DuPont Tr. 92:16-93:9.

<u>MEMORANDUM OF LAW</u>

### I.      Introduction and Summary Judgment Standard

Claimant has at various points argued the he was hit by an "unknown female" jet ski driver.  However, Claimant was unable to produce the one witness (his best friend) who could testify regarding this unknown female driver for a deposition.  *See* Playtime's Motion for Summary Judgment (DE 24).  Now, it is unclear from Claimant's motion for summary judgment whether he believes Playtime was negligent *per se* in training an "unknown female" driver, or whether he believes Playtime was negligent in training him.  *Compare* DE 25 at 16 ("Playtime has no idea who was operating the PWC that struck DuPont") *with* DE 25 at 19 ("As a result of Playtime's breach, DuPont was an untrained renter who used the PWC in an unsafe manner and was injured.").

Claimant broadly alleges that his training in operating his PWC was inadequate, but he ignores numerous pieces of record evidence concerning the instructions he was provided and testified that he was not paying attention to what the Playtime attendant was saying to him. *See*

**Exhibit B** DuPont Tr. 64:8-10 ("**I don't know what he was reading because I wasn't really paying attention like that.**").  His own recollection of his training – the primary evidence upon which he bases his negligence *per se* allegations – is somewhat lacking.  Claimant does not allege that he did not understand or that he had difficulty with any particular aspect of operating his PWC.  Rather, he recites a group of ten requirements for PWC safety training from the applicable regulations and alleges that Playtime was negligent in training him in all of them.  As explained in detail below, there is record evidence showing that Playtime provided Claimant with training in each of these areas, giving rise to – at the very least – a genuine issue of material fact.

Claimant then piles inference upon inference arguing that the Pennsylvania Rule of maritime law shifts the burden of causation to Playtime *at the summary judgment phase* of this Limitation Action without citing any cases to support the argument that the Pennsylvania Rule would support shifting the burden on causation before trial where the only showing of negligence is based largely on the Claimant's own selective testimony with little corroborating evidence.  Finally, Claimant's argument that he is entitled to punitive damages is without merit.

Summary judgment is only appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A disputed fact is material if "it might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering whether a genuine issue exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at 255.

**II**    **Playtime Did Not Violate The Florida Vessel Safety Law.**

   **A.    Record Evidence Shows that Playtime Did Not Violate Either Fla. Stat. § 327.39 or Fla. Stat. § 327.54.**

Claimant argues that Playtime violated Fla. Stat. § 327.39 or Fla. Stat. § 327.54 by failing to provide certain types of training; however, there is record evidence of Playtime providing each type of training discussed.  Therefore, summary judgment is not appropriate as to these issues.

> 1. *There Is Record Evidence of Playtime Providing Claimant Training in Each of the Areas that He Claims He Did Not Receive  Training.*

"[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1322 (11th Cir.1982).  Claimant has not and cannot allege that there was any aspect of PWC training that Playtime did not provide that was a contributing cause of his accident.  Therefore, he has falsely made the blanket statement that Playtime failed to provide any training as to large portions of statutory and regulatory requirements when the record evidence – much of which contains Claimant's signature – shows that this is not true.  Playtime followed the applicable PWC safety laws.  Even though Claimant disputes this, his selective testimony on the rental and training process[2] makes summary judgment inappropriate.

---

[2] As provided in the case of *Straw v. Aquatic Adventures Mgmt. Grp.*, No. 5:11-cv-102, 2011 U.S. Dist. LEXIS 121652, at *7 (N.D. Fla. Oct. 20, 2011), Florida Statute 327.54 "does not call for live instruction or an interactive presentation."  See also *In re Complaint of Rockaway Jet Ski, LLC*, No. 14-CV-1979, 2016 U.S. Dist. LEXIS 187673, at *13 (E.D.N.Y. Dec. 19, 2016) ("46 U.S.C. § 13102—Navigation Law § 73-a(2), … simply requires that the renters of recreational personal    watercraft    receive    certain    initial    instructions    and    supervision").

Claimant alleges that Playtime did not instruct its customers on the following items in violation of Fla. Stat. §§ 327.39 and 327.54. 1) Operator responsibility, good judgment on the water, and avoiding careless, reckless, and negligent operation of vessels; 2) Navigation rules, including maintaining proper lookout, safe distance and speed, operating defensively, and requirement to give way to other vessels; 3) Aids to navigation, buoys, and other waterway markers; 4) Causes and prevention of personal watercraft accidents; 5) Propulsion, steering, and stopping characteristics of the PWC; 6) Boarding, falling off, capsizing, and reboarding; 7) The dangers of wake or surf jumping and other reckless operations; 8) Specific personal watercraft safety requirements (defined in the applicable statute and regulations as wearing personal floatation devices, using kill switch lanyard, location of whistle and fire extinguisher, age requirements for personal watercraft operation, and lawful hours of operation); 9) Boating safety identification cards, age and engine requirements, and photographic identification; and 10) Florida divers-down flag requirements. DE 25 at 11-13.

In fact, there is record evidence that Playtime provided Claimant with **multiple sources instructing him in each of these areas**. First, operator responsibility, good judgment on the water, and avoiding careless, reckless, and negligent operation of vessels is covered in Playtime's verbal training and on-the-water demonstration (**Exhibit A**, Sett Tr. 85:13-87:1); on the PWC safety checklist that Claimant initialed and signed; on the warnings on the PWC console immediately in front of the driver (**Exhibit F**, Photographs of PWC Riding Practice Guides located on PWC consoles); on the boater safety test and its study guide (**Exhibit G**, FWC Boater Safety Test, Questions 9, 16, 20; **Exhibit H**, Boater Safety Study Guide); and finally on the large yellow FWC Motorboat Rental Safety Signs located on Playtime's rental booth (**Exhibit E**, Photograph of FWC Motorboat Rental Safety Sign).

10

Second, navigation rules, including maintaining proper lookout, safe distance and speed, operating defensively, and requirement to give way to other vessels are covered in Playtime's verbal instructions and on-the-water training (Sett Tr. 87:15-23); on the PWC safety checklist that Claimant initialed and signed; on the warnings on the PWC console immediately in front of the driver[3]; on the boater safety test and its study guide at questions 3, 6, 14, 17, 19, and 23; and finally on the large yellow FWC Motorboat Rental Safety Signs located on Playtime's rental booth.

Third, aids to navigation, buoys, and other waterway markers are covered on the FWC boater safety test at Question 11 and on Playtime's Boater Safety Study Guide.[4]

Fourth, causes and prevention of personal watercraft accidents are covered on the PWC safety checklist that Claimant initialed and signed; on the warnings on the PWC console immediately in front of the driver; on the boater safety test and its study guide at questions 4, 7, 12, 21, 25; and finally on the FWC Motorboat Rental Safety Signs.

Fifth, propulsion, steering, and stopping characteristics of the PWC are covered in Playtime's verbal instructions and on-the-water training (Sett Tr. 85:13-87:1 and 92:16-93:24); on the PWC safety checklist that Claimant initialed and signed; on the warnings on the PWC console immediately in front of the driver; and on the boater safety test and its study guide at question 8.

---

[3] For the purposes of clarity and brevity, Playtime is not repeating all of the exhibit numbers and names for training areas 2-10.  The corresponding exhibit names and numbers can be found in Playtime's summary of its instruction in operator responsibility, *supra*.

[4] Claimant also has not made any allegations relating to navigation aids, buoys, or waterway markers causing or contributing to his accident.

Sixth, boarding, falling off, capsizing, and reboarding are covered in Playtime's verbal instructions and on-the-water training (Sett Tr. 91:21-92:13); on the PWC safety checklist that Claimant initialed and signed; on the boater safety test and its study guide at question 22; and finally on the Motorboat Rental Safety Signs.

Seventh, the dangers of wake or surf jumping and other reckless operations are covered in Playtime's verbal instructions and on-the-water training (Sett Tr. 92:16-93:24); on the PWC safety checklist that Claimant initialed and signed; on the warnings on the PWC console immediately in front of the driver; and on the boater safety test and its study guide at question 18.

Eighth, specific personal watercraft safety requirements are covered in Playtime's verbal instructions and on-the-water training (Sett Tr. Sett Tr. 85:13-87:1); on the PWC safety checklist that Claimant initialed and signed; on the warnings on the PWC console immediately in front of the driver; on the boater safety test and its study guide at questions 1 and 10; and finally on the large yellow FWC Motorboat Rental Safety Signs located on Playtime's rental booth.

Ninth, boating safety identification cards, age and engine requirements, and photographic identification are covered on the warnings on the PWC console immediately in front of the driver and on the boater safety test and its study guide at questions 2, 13, 15, 24.

Tenth and finally, Florida divers-down flag requirements are covered on the boater safety test and its study guide at question 5.[5]

### 2. Claimant's Argument that the Sequence of Playtime's Training Program Makes the Instruction "a Nullity and a Farce" Is Without Merit.

There is no validity to Claimant's argument that the waiver and safety checklist he signed and initialed are "a nullity and a farce" because of the sequence of his safety instructions.

---

[5] Claimant has never alleged that this case involves divers or any other SCUBA equipment.

Claimant alleges that Playtime "made" him sign the waiver on checklist without the benefit of seeing the PWC he had been renting. In fact, Playtime's customers are not kept inside a building out of view of the PWCs as Claimant alleges. Playtime operates a booth on the beach and keeps its jet skis on the beach's shoreline. *See* **Exhibit A at Exhibit 3** FWC Boating Incident Report at 28 (depicting the booth's location on Miami Beach). Customers stand at the booth – in plain sight of the shoreline and the PWCs – and complete the written portion of their PWC safety training and the required paperwork (with the advantage of a dry, hard surface on which they can write). Then, Playtime's instructors provide a PWC demonstration and on-the-water training at the shoreline and in the water near the beach. Customers are not, as Claimant alleges, asked to sign that they have received training before the training occurs. Instead, customers read the waiver and safety checklist, initialing that they understand each written instruction as they read it and indicating that they do not have any physical limitation that would prevent them from operating the jet ski based on their understanding of their own physical abilities and medical history. Then, customers complete the demonstration and an on-the-water training to reinforce the written instructions they have just reviewed and to give them a chance to ask the instructor any questions they may have. None of the statutes or regulations at issue specify any sequence in which training must be given, and Claimant's attempt to impose an additional requirement on PWC liveries is futile.

    **B.**    **There Is a Genuine Issue of Material Fact as to Compliance with Fla. Stat. § 327.395**

Claimant is not entitled to summary judgment as to Playtime's compliance with Fla. Stat. § 327.395. At the end of each month, Playtime mails all of its boater safety tests to the FWC. Playtime gives the other copy of the test to its customers. Playtime has contacted the FWC to

locate Claimant's test, but the FWC has indicated that it no longer has copies of tests given on the day of the accident.

Playtime's owner, Andrew Sett, testified that when he was notified of the accident by Playtime's operations manager, David Wood, he asked Mr. Wood whether Claimant had taken a boater safety test.  Sett Tr. at 60:22-61:5.  Mr. Wood responded that Claimant had taken and passed the FWC Boater Safety Test.  Id.  There is no indication from either the Boating Accident Report or the Investigative Case Report that any FWC officers inquired about the test during their investigation.  See **Exhibit A at Exhibit 3**, Boating Accident Report; **Exhibit D at Exhibit 8**, Investigative Case Report.  Therefore, to the best of Playtime's knowledge, its copy of Claimant's test was sent to the State with all the other tests for the month as a part of Playtime's normal document retention practices.

Claimant's main evidence supporting his allegation that he was never given a Boater Safety Test is his own recollection as reflected in his deposition testimony.  However, it should be noted that Claimant's memory of the day of the accident – and his training in particular – seems to be lacking.  Claimant testified that he does not remember one way or the other whether he reviewed safety documents provided by Playtime or warnings on the PWCs.  DuPont Tr. 62:11-6.  At one point in his deposition, Claimant testified that he was "certain" he did not sign any documents besides the waiver.  DuPont Tr. 65:11-17.  Later, he admitted that he signed the PWC Safety Checklist as well.  DuPont Tr. 119:23-123:12 .

Claimant then testified that he only remembers Playtime's instructors telling him "'You can go this way, go that way.  This is gas and this is brake.'  That's all I remember."  DuPont Tr. 63:23-25.  Claimant testified at least five times that he specifically remembers Playtime's instructors showing him the brakes to the PWC. (Id.; Id. at 64:3-4; Id. at 68:24-69:1; Id. at 78:19-

14

22; Id. at 80:6-7).    PWCs – like other boats – do not have brakes.   In fact, Claimant was repeatedly warned of PWCs lack of brakes on the checklist he initialed, on the warning signs displayed at Playtime's rental booth, and on the console of the PWC itself.

Claimant further testified that the PWCs did not have any warnings or instructions on them.  DuPont Tr. at 80:11-81:2.  In fact, there are large, prominent warnings on the consoles of the PWCs immediately in front of the driver.  **Exhibit F**, Photographs of PWCs.  When asked about Playtime' employees explaining the waiver to him, he replied "**I don't know what he was reading because I wasn't really paying attention like that.**"  DuPont Tr. 64:8-10.

Playtime has provided testimony that Claimant took and passed the FWC Boater Safety Test and explained its document retention practices.  Claimant relies primarily on his own recollection of his training to assert that he was not given a test, and that recollection is unclear.  Summary judgment should be denied.

## III.    The Pennsylvania Rule Is Not Applicable Because Claimant Has Not and Cannot Establish Negligence

As discussed above, Claimant cannot meet his burden to show that Playtime was negligent, or even negligent *per se*.  See Playtime's Motion for Summary Judgment (DE 24).  However, even if the Court were to find that Playtime was negligent *per se*, application of the Pennsylvania Rule would still be inappropriate in this case.

> "The former Fifth Circuit Court of Appeals has held that in The Pennsylvania the Supreme Court 'did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable or remote.'"  *Orange Beach Water, Sewer & Fire Prot. Auth. V. M/V Alva*, 680 F.2d 1374, 1381 (11th Cir. 1982) (*quoting Compania de Maderas de Caibarien, S. A. v. The Queenston Heights*, 220 F.2d 120, 122-123 (5th Cir.), *cert. denied*, 350 U.S. 824 (1955)).

Claimant only reaches the argument that the Pennsylvania Rule should be used to shift the burden on causation by first arguing that some unspecified training error caused Claimant's accident either due to improper training of an "unknown female" driver or due to improper training of Claimant himself.  This is piling inference upon inference, a maneuver that has been widely disapproved by courts in this District.  *See Fisher v. Carnival Corp.*, No. 11-22316, 2013 U.S. Dist. LEXIS 194679 at *7 (S.D. Fla. July 29, 2013); *Feinman v. Target Corp.*, 11-62480, 2012 U.S. Dist. LEXIS 173138, at *17 (S.D. Fla. Dec. 6, 2012).  "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

Claimant's reliance on *Tassinari v. Key West Water Tours, L.C.*[6] is inapposite.  In *Tassinari*, the livery against whom the Pennsylvania Rule was applied admitted that *none* of its employees had *ever* received *any* FWC-authorized training in PWC safety. In the case at hand, all of Playtime's employees have completed the same NASBLA Boater Safety Education courses that the *Tassinari* petitioners' employees failed to complete.  See Sett Tr. at 19:20-20:4; 39:5-13.

Claimant does not cite any other cases where the Pennsylvania Rule was applied at the summary judgment stage to shift the burden on causation before the court had an opportunity to consider the evidence concerning negligence.  Additionally, in each of the other cases that Claimant cites, the appellate courts courts either found that the trial courts erred in applying the Pennsylvania Rule, or the district courts only applied the Pennsylvania Rule after there was a showing of measurable, factual evidence proving negligence at trial (rather than primarily relying on Claimant's own deposition to show negligence). *See Orange Beach Water, Sewer &*

---

[6] Claimant refers to *Tassinari* as a decision by "this Court" (DE 17).  In fact, *Tassinari* was decided by Hon. K. Michael Moore.

*Fire Prot. Auth. V. M/V Alva*, 680 F.2d 1374, 1379 (11th Cir. 1982) (plaintiff established negligence by providing measurements and linear data showing that other boats could not navigate around the vessel and her tow without alliding with an exposed pipeline); *In re Superior Constr. Co.*, 445 F.3d 1334, 1337-38 (11th Cir. 2006) (claimants established that Petitioner blocked all but 38 feet of 120 foot channel under a bridge after dark with a black barge and tug with only four of twelve lights working); *Union Pac. R.R. Co. v. Kirby Inland Marine, Inc. of Miss.*, 296 F.3d 671, 673 (8th Cir. 2002) (finding that the district court erred when it invoked the Pennsylvania Rule based on a violation of the Truman-Hobbs Act concerning bridge obstruction of navigation channels); *Dir. Gen of India Supply Mission v. S.S. Maru*, 459 F.2d 1370 (2d Cir. 1972) (holding that the district court erred in applying the Pennsylvania Rule to the stranding of an overloaded vessel); *Wilkins v. Am. Exp. Isbrandtsen Lines, Inc.*, 446 F.2d 480, 485 (2d Cir. 1971) (finding that the district court erred in applying the Pennsylvania Rule where decedent dies of a heart attack following a maritime collision).

## IV.    Claimant Is Not Entitled to Punitive Damages.

The issue of punitive damages is not ripe for summary judgment – particularly where negligence and causation have not been, and cannot be, established.  Furthermore, punitive damages are not at issue in this stage of the Limitation Action.  Claimant did not seek punitive damages in his claim against Playtime (See DE 12), but he has argues in his motion for summary judgment that he is entitled to punitive damages based on Playtime's alleged "wanton, willful, or outrageous conduct."[7]  Since Claimant did not seek such relief in his claim for damages, on this fact alone, summary judgment should be denied and prayer for such damages stricken.

---

[7] Under Eleventh Circuit precedent, punitive damages are appropriate if specifically requested or if the complaint alleges conduct that supports a claim for punitive damages. *Scutieri v. Paige*,

Furthermore, Claimant's argument concerning the *Artamon* case as a basis for punitive damages is futile. First, Claimant did not plead punitive damages in his Claim. Second, the *Artamon* order on its face lacks evidence of conduct supporting a prayer for punitive damages. As a threshold matter, the summary judgment order that Claimant attached as Exhibit 9 to DE 25 only granted summary judgment as to statutory negligence. "This Order does not relieve Plaintiffs from their obligation to prove causation and damages, and does not foreclose the affirmative defense of comparative negligence." Order of the Court, *Artamon v. Playtime Watersports Equip. Rentals, Inc.*, No. 2015-020737-CA-01, p. 1 (Fla. 11th Cir. July 15, 2016). The *Artamon* court required a showing of causation, and as discussed above, Claimant cannot show that Playtime was negligent in this case, much less that any alleged negligence caused his injuries.

Following the Artamon incident, Playtime re-trained its employees to confirm that all of them understood the requirements for paperwork and boater safety training. Sett Tr. 119:12-

808 F.2d 785, 790-93 (11th Cir. 1987). In *Scutieri*, punitive damages were permitted and timely requested because the complaint alleged that the defendants "acted intentionally and maliciously, wantonly, willfully, in bad faith, with gross and reckless disregard for the rights and interest of the Plaintiffs . . . [and plaintiff claimed that the defendants' conduct was] so flagrant and wanton as to justify an award of punitive damages," *Cowley v. Sunset Yacht Charters, Inc.*, No. 10-61928-CIV-COHN/SELTZER, 2011 U.S. Dist. LEXIS 80265, at *23-24 (S.D. Fla. July 21, 2011). "Gross negligence goes beyond ordinary negligence and is the "willful, wanton, or reckless" infliction of harm." *Charnis v. Watersport Pro, Ltd. Liab. Co.*, No. 2:07-cv-00623-RLH-GWF, 2009 U.S. Dist. LEXIS 76022, at *15 (D. Nev. May 1, 2009) (citation omitted). No such claims or allegations are raised in Claimant's Answer. (DE 12)

120:11.  In addition, Playtime moved the former manager, John Oaks, who had been working on the day of the Artamon incident out of his managerial role at the company.  Sett Tr. 121:1-5.

DuPont, in seeking punitive damages, claims that Playtime may be held liable for punitive damages based on the conduct of its agents or employees if Playtime authorized or ratified the act the subject of the punitive conduct.  DuPont cites to the cases of *Hastings v. Carnival Corp.* and *J.G. v. Carnival Corp.*, to support his claim for punitive damages.  However, these two cases did not involve a limitation/exoneration action and the request for punitive damages was specifically requested the initial Complaints.  **Exhibit I**.   Here, DuPont did not file a Complaint and his Claim/Answer neither seeks punitive damages nor contains language alleging that Playtime's conduct was willful and reckless.   As elicited in the case of *Doe v. Carnival, there has to be some notice of the request for punitive damages either in the demand or by the allegations.  Doe v. Royal Caribbean Cruises, Ltd.*, 2012 U.S. Dist. LEXIS 36274, *13. Furthermore, the cases that Claimant cites show an entirely different degree of willful, wanton, or outrageous conduct than what Claimant has alleged in this case – notwithstanding that there is no record evidence of conduct in this case that can support punitive damages.   *See e.g. Lobegeiger v. Celebrity Cruises, Inc.*, No. 11-21620, 2011U.S. Dist. LEXIS 93933 *1 (S.D. Fla. Aug. 23, 2011) ("A plaintiff **may** recover punitive damages under general maritime law, consistent with the common-law rule, where the plaintiff's injury was due to the defendant's **wanton, willful, or outrageous conduct**.") (Emphasis added). Claimant has not made any allegations that Playtime employees engaged in similarly egregious conduct – nor, is there any evidence to support same in the record.

**V.      Summary Judgment is Not Appropriate on Release/Waiver As a Matter of Law**

Claimant seeks summary judgment, taking the position that the Release is unenforceable as a matter of law.  However, he does not take issue with the language of the release.  Therefore, it is undisputed that the terms of the release and waiver are clear and unambiguous.[8] Notwithstanding this, with respect to the request for entry of summary judgment as a matter of law, such claim fails.  Here, there is no evidence of negligence or even negligence *per se* against Playtime to warrant the invalidation of the Release and Waiver that was signed by Claimant DuPont.  *See supra* and Petitioners Motion for Summary Judgment at DE 24.

As part of the rental process, the renter would review and sign the Release/Waiver and the checklist.  The release specifically provides affirmative language that the renter, here the Claimant, acknowledges "that I have been fully briefed on safety procedure and the safe operation of this equipment involved in the activity.  I agree to follow the instructions provided to me…"  **Exhibit A at Exhibit 2** Rental Contract.  The checklist which is used in the training portion of the rental process, provides training and information on a variety of areas including operating the PWC defensively, avoiding aggressive maneuvers, how to right the PWC in open

---

[8] Under federal maritime law, "a pre-accident waiver will absolve an owner or operator of liability for recreational accidents taking place on navigable waters where the exculpatory clause '(1) is clear and unambiguous; (2) is not inconsistent with public policy; and (3) is not an adhesion                                                                                                   contract.'" *In re Complaint of Rockaway Jet Ski, LLC*, No. 14-CV-1979 (JMA), 2016 U.S. Dist. LEXIS 187673, at *10 (E.D.N.Y. Dec. 19, 2016) (citations omitted). *See also Charnis v. Watersport Pro, Ltd. Liab. Co.*, No. 2:07-cv-00623-RLH-GWF, 2009 U.S. Dist. LEXIS 76022 (D. Nev. May 1, 2009).

water and provides for questions from renter on what was covered.. **Exhibit A at Exhibit 2** Rental Contract. Claimant admitted that he signed the Waiver and the PWC Checklist. **Exhibit B**, DuPont Tr. 119:23-123:12. Mr. DuPont is an adult who should be aware of the safety rules that he agreed to. It further would be unfair and unequitable for him to avoid the terms of the Release and Waiver that he agreed to. *See e.g. In re Royal Caribbean Cruises Ltd.*, 459 F. Supp. 2d 1275, 1279 (S.D. Fla. 2006).

As provided in the case of *Straw v. Aquatic Adventures Mgmt. Grp.*, No. 5:11-cv-102/RS-CJK, 2011 U.S. Dist. LEXIS 121652, at *7 (N.D. Fla. Oct. 20, 2011), Florida Statute 327.54 "does not call for live instruction or an interactive presentation." There, in analyzing summary judgment on the language of the release and where a similar checklist (**Exhibit J**) was provided in compliance of said statute and during the rental process, the Court noted that "[w]ithout resorting to a battle of the dictionaries, it is possible that an informative checklist may meet this requirement [Florida Statute 327.54]"; however, he ultimately concluded that this issue was one for trial and denied summary judgment. Claimant's Motion for Summary Judgment should likewise be denied.

**FOR THE FOREGOING REASONS**, Claimant respectfully requests that the court deny Claimant's motion for summary judgment.

May 24, 2018                                  Respectfully submitted,


                                              s/ *Bianca G. Liston*
                                              M. GARY TOOLE, ESQ.
                                              *Trial Counsel*
                                              Florida Bar No. 710814
                                              BIANCA G. LISTON, ESQ.
                                              Florida Bar No. 0555592
                                              MCDONALD TOOLE WIGGINS, P.A.
                                              111 N. Magnolia Avenue Suite 1200

Orlando, Florida 32801
Telephone: (407) 246-1800
Facsimile: (407) 246-1895
Primary Service Email:
gtoole@mtwlegal.com
Secondary Service Email: e.service@mtwlegal.com
*Attorneys for Petitioners*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 24, 2018, the foregoing was electronically filed with the Clerk of Court via the CM/ECF system.

*s/ Bianca G. Lsiton*
M. GARY TOOLE, ESQ.
*Trial Counsel*
Florida Bar No. 710814
BIANCA G. LISTON, ESQ.
Florida Bar No. 0555592
MCDONALD TOOLE WIGGINS, P.A.
111 N. Magnolia Avenue Suite 1200
Orlando, Florida 32801
Telephone: (407) 246-1800
Facsimile: (407) 246-1895
Primary Service Email:
gtoole@mtwlegal.com
Secondary Service Email: e.service@mtwlegal.com
*Attorneys for Petitioners*